## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

LOS LUNAS PUBLIC SCHOOLS
BOARD OF EDUCATION

      Respondent-Appellant,

v.                                                      No. 21-cv-01082 DHU-SCY

CHRISTY and DAVID SCHNEIDER,
as parents of L.S., Student (a minor),

      Petitioners-Appellees.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Los Lunas Public Schools' Board of Education ("Los Lunas Public Schools," "LLPS," or "the District") Complaint for Judicial Review Pursuant to Section 20 U.S.C. § 1415 (Doc. 1). The District filed its Brief in Chief (Doc. 23), Christy and David Schneider ("Parents" or "the Schneiders") responded (Doc. 24), and the District replied (Doc. 25). The District seeks judicial review under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The District requests that the Court overturn the decision of a New Mexico Department of Education Due Process Hearing Officer ("Hearing Officer" or "DPHO") concerning Parents' minor child, L.S. Having reviewed the Administrative Record ("AR"), governing law, and the parties' arguments, the Court affirms the Hearing Officer's decision in its entirety.

## I.    IDEA GENERAL FRAMEWORK

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, —— U.S. ——, 137 S. Ct. 743, 748 (2017) (citing 20 U.S.C. § 1412(a)(1)(A)). The IDEA enshrines "our national policy of

1

ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C.A. § 1400(c)(1).

Once a public educational agency accepts the IDEA's financial assistance, an eligible child acquires a "substantive right" to a FAPE. *Fry*, 137 S. Ct. at 749 (citation omitted). "[A] FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* at 748-49 (citing 20 U.S.C. §§ 1401(9), (26), (29)).

Responsibility for implementing the IDEA and policing IDEA compliance rests with the States. *Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262, 1269 (10th Cir. 2007). "The IDEA places a variety of obligations on state education agencies (SEA), … and on local education agencies (LEAs)[.]" *Chavez ex rel. M.C. v. New Mexico Pub. Educ. Dep't*, 621 F.3d 1275, 1277 (10th Cir. 2010). Under the IDEA's "child find" requirement, States are obligated to "'identif[y], locat[e], and evaluat[e]' '[a]ll children with disabilities residing in the State' to ensure that they receive needed special-education services." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009) (quoting § 1412(a)(3)(A)). "[T]he school bears the burden generally in identifying eligible students for the IDEA[.]" *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1066 (10th Cir. 2002).

"[A]n 'individualized education program,' called an IEP for short, serves as the 'primary vehicle' for providing each child with the promised FAPE." *Fry*, 137 S. Ct. at 749 (citation omitted). The IEP "includes, among other items, a statement about the child's current levels of academic achievement, annual goals to allow the child to make academic progress, and a description of how the school will measure the child's progress." *Preciado v. Bd. of Educ. of*

*Clovis Mun. Sch.*, 443 F. Supp. 3d 1289, 1296 (D.N.M. 2020) (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)).

If the child's parents and the school disagree over the student's IEP, a party may request a "due process hearing" to resolve the differences. *Preciado,* 443 F. Supp. 3d at 1296 (citing 20 U.S.C. § 1415(f)(1)(A)). "A DPHO conducts this hearing and makes an administrative finding that the school has or has not denied the student a FAPE." *Preciado,* 443 F. Supp. 3d at 1296 (citing § 1415(f)(3)(A), (E)). The IDEA affords "[a]ny party aggrieved by the findings and decisions" made during or pursuant to the impartial due process hearing an opportunity for judicial review. 20 U.S.C. § 1415(i)(2)(A). The prevailing party may bring an action in federal district court requesting its attorney's fees. *Preciado,* 443 F. Supp. 3d at 1296 (citing § 1415(i)(3)).

## II.   PROCEDURAL BACKGROUND

On April 26, 2021, Parents filed their Request for Due Process Hearing, DPH 2021-17, against Los Lunas Schools and the New Mexico Public Education Department.[1] Doc. 24 at 7. The Hearing Officer held prior to the due process hearing that he did not have jurisdiction over the IDEA claims asserted against NMPED. Doc. 4, 55. On May 25, 2021, NMPED was dismissed from the case due to the lack of jurisdiction over the claims against the NMPED. *Id.* However, effective May 26, 2021, the Board of Education of Los Lunas Schools (BOE) was suspended by the State Educational Agency (SEA), New Mexico Public Education Department (NMPED). *Id.*

---

[1] Prior to filing their Request for Due Process, Parents submitted an IDEA state complaint against LLPS. Doc. 4, 57. On January 31, 2020, the NMPED issued a Complaint Resolution Report in response to the IDEA state complaint. *Id.* NMPED's investigation resulted in a conclusion that the District has failed to develop and implement an IEP to meet Student's needs and that Student has been denied a free appropriate public education (FAPE). *Id.* NMPED ordered the District to take corrective action and monitored the implementation of the corrective action. *Id.* This was over the course of the school closures due to the COVID-19 pandemic. *Id.* As of the time of the administrative hearing in this case, most of the corrective action had been completed, including the provision of compensatory education services to Student. *Id.*

On June 4, 2021, NMPED was "reinstated" to the case solely due to the NMPED suspension of the District's School Board. *Id.* On June 16, 2021, an order was issued clarifying that (1) the claims in the Complaint against NMPED remain dismissed for lack of jurisdiction; (2) the only claims to be litigated in the case are those asserted against the District, and (3) NMPED had been added as a party only because the NMPED presently has legal authority for the District due to the suspension of the District's School Board and to ensure provision of a remedy, if any, for the District's denial of FAPE to the Student.[2] *Id.*

The due process hearing on Petitioners' claims against Los Lunas Schools was held over four days in June and July 2021. Doc. 23 at 1. The DPHO rendered his initial decision on September 17, 2021. *Id.* On September 21, 2021, Petitioners filed a Motion for Modification of Decision, which the DPHO granted. *Id.*, 2. On September 22, 2021, the DPHO amended his decision to clarify that the DPHO intended continuing jurisdiction over the remedy he ordered. Doc. 24, 8. The District filed a Motion for Clarification, requesting clarification for the basis of the DPHO's continuing jurisdiction. Doc. 23, 2. Finally, on October 6, 2021, the DPHO entered

---

[2] In July 2021, NMPED appointed members to a Los Lunas Public Schools Governing Council to fulfill the role of the Board pending the suspension. *Id.* However, the NMPED Secretary retained legal authority over the Governing Council during the Board's suspension. *Id.*, 55-56. Since the effective date of the BOE suspension, the Superintendent of Los Lunas Schools reports directly to the NMPED Secretary of Education. *Id.*, 56. As of the date of the Due Process Hearing Officer's decision in the underlying matter, the District's School Board remained under suspension. *Id.* A hearing on the Board's suspension took place on July 28, 2021 and was scheduled to be completed on August 24, 2021. *Id.* On August 24, 2021, NMPED Secretary Designate Kurt Steinhaus made permanent the May 25, 2021, suspension of the Los Lunas school board. *Id.*

NMPED has not taken a position on the merits of this case, allowing the due process proceedings to proceed between the Petitioners and District as intended by the IDEA. *Id.* However, NMPED objects to issuance of an order that requires NMPED to provide direct services to Student, as opposed to monitoring the implementation of the due process hearing decision. *Id.*

his Final Amended Memorandum Decision, which contains no continuing jurisdiction provision

for the DPHO.  *See* Doc. 4, 3-84.

### III.   FACTUAL BACKGROUND

#### a.   The Student's History

The Hearing Officer found the following:[3]

L.S. ("Student") was born in July 2006.[4]  Doc. 4, 18.  L.S.'s parents are Christy and Dr.

David Schneider.  *Id.*  L.S. has Angelman Syndrome ("AS") and has been identified as a student

with a disability eligible under IDEA for special education since preschool.  *Id.*  L.S. was diagnosed

with AS after Parents noticed that he was not "meeting certain milestones of development" around

the age of four.  *Id.*

AS is a rare neuro-genetic disorder that occurs in one in 15,000 live births or 500,000

people worldwide.  *Id.*  AS shares symptoms and characteristics with other disorders including

autism, cerebral palsy, and Prader-Willi Syndrome.  *Id.*, 18-19.  Common characteristics of AS

include developmental delays, happy demeanor (frequently laughing, smiling, and being easily

excitable), sleep problems, and lack of speech.  *Id.*, 19.  Mosaic Angelman Syndrome signifies

milder symptoms of AS.  *Id.*

L.S. was determined to be eligible for special education while in preschool under the

eligibility categories of Other Health Impairment and Intellectual Disability.  *Id.*  L.S. qualifies for

---

[3] In recounting the factual background, the Court gives due weight to the factual findings of the Hearing Officer.  *See L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).

[4] The Court refers to the Administrative Record ("AR") filed in this matter by LLPS.  *See* Doc. (Notice of Submission of Record).  The AR is comprised of five sections totaling over 3,000 pages. *See* Docs. 4-8.  The Court cites the AR by the document number and page number imprinted by the Court's case management/electronic case file system (e.g., Doc. 4, 201).

related services of speech language therapy, occupational therapy, and physical therapy; he also has social work service listed on his IEP. *Id.*

L.S. is a nonspeaking individual who communicates with Augmented Alternative Communication ("AAC"), gestures, some signs, and use of technology, using an iPad or other portable device, loaded with Proloquo2Go, which allows him to combine icons and words to convey meaning, wants, and needs, as well as to answer questions. *Id.* L.S. expresses himself primarily through sign language and the Proloquo2Go software downloaded onto his iPad. *Id.*, 21.

L.S. loves people and enjoys being with people. *Id.*, 49. Parents have always wanted him to be educated with peers, including typical peers, as much as possible. *Id.* L.S. loves physical activities (basketball, kicking balls, swinging, swimming), being outdoors, outings, and joining in on activities with others. *Id.*, 37. He is very outgoing, friendly, and helpful. *Id.* He has learned to safely drive the family's four-wheeler around the 2-acre yard. *Id.* L.S. is generally very happy and frequently reaches out to touch and hug people, including those he does not know. *Id.*, 38. L.S. is "eminently teachable." *Id.* He loves the reading lessons his mother is presenting based on Don Johnson curriculum for teaching sounds and letters. *Id.* Parents routinely put together information about L.S. for staff and the IEP team, to aid people in getting to know him and understand him. *Id.*, 38. Parents believe that L.S. should be in school full-time with peers; he craves the interaction with both adults and other students. *Id.*, 49.

L.S. began preschool at Bosque Farms and remained there until middle school. *Id.*, 21. During elementary school in Los Lunas (preschool through 4th grade), L.S. was a full member of the school community who was well-liked by and enjoyed his peers. *Id.*, 49.

6

For middle school, L.S. was assigned to Valencia Middle School, but he never attended. *Id.*, 21.  He did however visit Valencia Middle School on two separate occasions in August of 2018.  *Id.*  After L.S.'s two visits to Valencia Middle School in August 2018, the District cancelled a scheduled IEP to address L.S.'s placement and education at Valencia.  *Id.*, 50.  No IEP was written or implemented which would have called for a Board-Certified Behavior Analyst ("BCBA") to work with L.S. and his staff at school so that staff could learn how to support L.S. *Id.*  L.S. received no instruction for reading, math, written language during 6th, 7th, and 8th grades. *Id.*, 33.

At various times throughout L.S.'s education, L.S.'s teachers and other school employees have observed L.S. exhibiting behaviors that disrupted the classroom environment, such as, on one occasion, disrobing, defecating, and throwing feces over a file cabinet.  *Id.*, 21-22.

The District's most recent evaluation of L.S. is from September 2014.  *Id.*, 52.  The District has conducted no evaluations of L.S. for nearly 7 years (as of September 2021).  *Id.*  Reevaluations need to be completed every 3 years.  *Id.*  L.S.'s May 2020 IEP states that the District needed the 3-year evaluation to be able to ascertain L.S.'s present levels of performance.  *Id.*  No one at Los Lunas ever initiated an evaluation for L.S. since the May 2020 IEP indicated that reevaluation was needed to determine L.S.'s present levels.[5]  *Id.*

In 2017, the District contracted with Erin Sheldon, M. Ed., who had extensive experience with students diagnosed with Angelman Syndrome to provide training to teachers and staff on Angelman Syndrome.  *Id.*, 22; Doc. 6, 713.  Ms. Sheldon provided a report of recommendations for L.S..  *Id.*, 22; Doc. 6, 713.

---

[5] L.S. did have an independent Assistive Technology evaluation, pursuant to the settlement agreement in DPH 1718-05, in 2018.  Doc. 4, 52.

The last IEP that was done when L.S. was attending school on a campus is from March 2017. Doc. 4, 34. Parents, per the April 4, 2017 IEP Addendum, rejected services being provided in their home. *Id.*, 19. The District subsequently offered "Homebound Services" for L.S. "Monday through Thursday at the Bosque Farms Tennis Courts." *Id.* This consisted of 30 minutes "at the Bosque Farms Tennis Courts," instead of full day schooling on a school campus, as was provided to other students. *Id.*, 34. The Tennis Courts were a completely enclosed "caged" space outside. *Id.* The Tennis Court arrangement occurred after school staff had been unsuccessful in providing education to L.S., who they were instead confining to a closet/storage room and then ultimately suspending from school. *Id.* Ms. Schneider testified:

> I walked into a classroom [--] it wasn't even a classroom; it was more like a closet room where they kept storage stuff. And the window was covered with paper so you couldn't see in from the outside.

> I walked in to see my son boxed in a corner with high shelves and one lower, with an aide and a teacher sitting at a table far away just looking at him. He was fully undressed, having a meltdown and trying to get attention. He had nothing back there. He was just back there all by himself.

*Id.*, 34-35.

At the time L.S. was going to Tennis Court school, he would not let his mother leave him there without her being present. *Id.*, 35. According to his mother, the District's use of confinement had a negative impact on L.S. at the time and since then. *Id.* Not attending school for more than 4 years has created learned behavior for L.S. of not being in school. *Id.* Not having any school to attend for more than 4 years has been very isolating for L.S. *Id.*, 49.

In the 2017-2018 school year, L.S. missed a significant number of days of school and was automatically disenrolled, per school policy, after having missed ten (10) or more consecutive days. *Id.*, 22, 52; Doc. 6, 534. The District reported to the State that L.S. was not attending school

and also that he had been dropped due to 10 consecutive days of absence and his whereabouts was unknown.  Doc. 4, 51.

In 2018, Los Lunas wrote an IEP for L.S. that provided for a shortened day/shortened school week based on his behaviors.  *Id.*, 23.  The November 2018 IEP inaccurately recorded that L.S. received "100%" of his education in a special education setting, which was inaccurate and untrue at the time the IEP was written and during all time that the IEP was in effect.  *Id.*, 47.  The November 2018 IEP inaccurately recorded that L.S. received his special education at his neighborhood school.  *Id.*  The November 2018 IEP recorded that the District psychologist, the contracted BCBA, and parents would create a "support plan" for L.S. to be reviewed by the IEP team.  *Id.*  The LEA never moved forward to have anyone create a support plan and there was never a support plan created or considered by the IEP team.  *Id.*  Los Lunas never provided explanation or Prior Written Notice ("PWN") about why it was not having L.S. attend school or provide him with education; when IEPs were written, the documents falsely stated that L.S. was receiving education and, in some cases, tried to create an impression that he was receiving a full school week ("100%") of special education when he was not in school and was not receiving any hours of education.  *Id.*, 47-48.

LLPS is L.S.'s Local Educational Agency ("LEA").  *Id.*, 20.  In September 2017, the Parents filed an IDEA due process request against LLPS (DPH 1718-05), which was settled.  *Id.*  As result of DPH 1718-05 Settlement Agreement with Los Lunas in fall 2017, L.S. was to attend Valencia Middle School for 6th grade.  *Id.*, 33.  However, the LEA never created an IEP that provided for his attendance at Valencia MS, and he never attended there as a student for 6th, 7th, or 8th grades.  *Id.*

In December 2019, Parents filed an IDEA state complaint (CR 1920-13) against LLPS, which resulted in a determination of denial of FAPE and a Corrective Action Plan ("CAP") in January 2020.  *Id.*, 20.  After LLPS had received the CAP from NMPED, it provided minimal instruction (about 3 weeks of several days a week for 30 minutes) over Zoom from a teacher for several weeks in summer 2020 along with some related service time, by therapists "co-treating." *Id.*, 48.  L.S. was unable to participate independently and his access depended on his mother being available to support him at all times.  *Id.*

Since the 2017-18 school year, the LEA never offered or provided full day education for L.S.  *Id.*, 36.  Instead, the LEA wrote IEPs which describe a reduced schedule, and then did not implement those or provide any hours of education.  *Id.*  After NMPED determined that Los Lunas had denied L.S. a FAPE (based on investigation of Parents' 2019 state complaint), the Superintendent of Los Lunas wrote to NMPED Director of Special Education to complain that the finding of denial of FAPE was not supported by evidence or that "the findings of the investigation are. . . beyond the scope of providing FAPE."  *Id.*, 36.  The District never provided NMPED with written assurance that it would abide by the Corrective Action Plan ordered.  *Id.*  In December 2019, in response to Parents' state level IDEA complaint, Los Lunas claimed that its goal was "to transition [L.S.] back into a school setting. . . ." but the District never took any steps before or after to transition L.S. to a school setting.  *Id.*, 49.

The District reported to NMPED, in STARs data, that L.S. was an 8th grade student at Los Lunas Middle School for the 2019-20 school year, when L.S. has never been assigned to or attended that school.  *Id.*, 50.  The District reported to NMPED, in STARS data, that L.S. was not a student who received special education in the 2019-20 and 2017-18 school years.  *Id.*  The

District reported to NMPED in STARS data, that L.S. was in a general education setting 40-79% of the school day during 2020-21 school year. *Id.*

b. **2020-2021 School Year and the Public Health Order**

At the end of March 2020, New Mexico school campuses were ordered closed by public health order. *Id.*, 20. Beginning in summer 2020, Parents began working with an online group called AAC Voices, and through that connection also began to have L.S. work in a reading curriculum called Readtopia which was taught by both his mother and supported online AAC Voices. *Id.*, 45. While LLPS agreed to reimburse Parents and pay for the Readtopia and AAC Voices online sessions, that agreement was only for up to 184 hours and was limited to Los Lunas seeking to "provide" the 184 hours of compensatory education ordered by NMPED as its CAP. *Id.*

When Los Lunas initiated some Zoom instruction and therapies for several weeks in summer 2020, L.S.'s ability to attend to the screen and to participate depended entirely on his Parent's minute-by-minute attention and direction. *Id.*, 45-46. According to Ms. Schneider, staff assigned to work with L.S. over Zoom for limited times in summer 2020 could not communicate successfully with L.S., with exception of the Speech-Language Pathologist. *Id.*

During the 2020-2021 school year, L.S.'s assigned school, Los Lunas High School, had a schedule for remote instruction for high school students from 8:00 a.m. to 2:30 p.m. *Id.*, 20. Los Lunas High School has about 1200 students. *Id.*, 29. Although schools in New Mexico were allowed to provide in-person small group instruction for students with disabilities during the entire 2020-21 school year, the Los Lunas Board of Education "would not let [schools] bring back students until the beginning of February [2021] in small groups;" these particular students were students with disabilities from the CEL (Community Enhanced Learning) classrooms. *Id.*, 23. *See*

11

*also* Doc. 6, 474; Doc. 4., 36 ("During the 2020-21 school year when public health orders limited

on campus instruction, New Mexico school districts always had the power to bring small groups

of students with disabilities back to the school campus. That never happened in Los Lunas which

apparently brought no students with disabilities to campuses for in-person learning until some

students at the elementary level came back 2 days in February and then middle school/high school

beginning for some students in March.") (internal citations omitted).  Beginning April 6, 2021,

"all" students had the option of returning to the campus for instruction from 7:40 to 2:30 each

school day.  Doc. 4, 20.

L.S.'s last IEP is dated May 1, 2020, along with an Addendum which was done on August

25, 2020, and a PWN done in April 2021.  Doc. 4, 20.  The actions outlined in the August 2020

Addendum to the May 2020 IEP have not been carried out.  *Id.*, 51.  L.S.'s May 1, 2020, IEP

provided for 360 minutes of Speech Language Pathology ("SLP"), Physical Therapy ("PT"),

Occupational Therapy ("OT") and Social Work in a special education setting per semester.  *Id.*,

21.  The May 2020 IEP documented that the LEA had no information about L.S.'s present levels

of academic achievement, performance, physical or occupational therapy needs or communication

skills.  *Id.*, 52.  Additional IEPs for L.S. also lack present levels of performance information.  *Id.*,

46.

At the May 2020 IEP, Parents proposed that L.S. attend school on a full-day schedule, 5

days per week with a full time BCBA to assist staff in learning to meet L.S.'s needs.  *Id.*, 49.  This

request is consistent with their longstanding belief that he should be able to go to school and be

supported by staff who are knowledgeable about AS and L.S.'s needs, and that staff need to learn

strategies to support L.S., including any challenging behaviors, from a BCBA.  *Id.*

The May 2020 IEP cut and pasted the communication goal from the November 2018 IEP, which had never been implemented, and after L.S. had been provided no speech language therapy service during 2 full school years (2018-19; 2019-20). *Id.*, 47. The May 2020 IEP included 2 goals about accessing the school environment, which have never been worked on; L.S. has never been to his "school," the Los Lunas High School campus. *Id.* The May 2020 IEP "accepts" Parents' proposal that L.S. begin school with a full day schedule with a full time BCBA alongside staff until such time as parents and the LEA agreed that staff were competent to deliver education to L.S., but then also states that the proposal was up for discussion at a later time. *Id.*, 48. The May 2020 IEP states that instructional strategies are "ongoing," when L.S. has not been in school and was not receiving any instruction from LLPS teachers. *Id.*

L.S.'s May 1, 2020 PWN indicated that District proposed to start supports for L.S. with a BCBA through a local agency for 300 minutes per week once the mandated social distancing ended. *Id.* L.S.'s May 1, 2020 PWN also indicated that the District proposed to accept the schedule of services, and Parent requested that they notify the District "if they wished to begin services;" the District agreed to that request. *Id.* L.S. was provided with an iPad with the Proloquo2Go app, visual supports, and a visual schedule as needed. *Id.*, 21.

After the May 2020 IEP, Parents were told that they had to "enroll" L.S. *Id.*, 46. They experienced multiple difficulties getting L.S. enrolled in 2020 and never understood until that time that the District had apparently "disenrolled" L.S. at some point in the past which they claim was without notice to them. *Id.*

On paper, L.S. was "assigned" to the Community Enhanced Learning ("CEL") classroom at LLHS for the 2020-21 school year; classes available were: Daily Living Skills, Functional Academics, Job Competency and Work Study. *Id.*, 38. The class had approximately 28 students

who were in all grades, ninth through twelfth; seven of whom were taught in person and the rest were taught through Zoom. *Id.* Educational Assistants assigned to the class included up to seven adults, when all students were in attendance before COVID. *Id.* Not all of the students were verbal. *Id.* The CEL teacher knows nothing about L.S.'s communication except that he is nonverbal and "uses a device." *Id.* She thinks L.S. could have communicated during Zoom classes through use of the "chat feature." *Id.*

During the 2020-2021 school year, L.S.'s IEP provided for 360 minutes of Social Work per semester for a total of 720 minutes for the year. *Id.*, 22. L.S. was provided 1,015 minutes total by his Social Worker, who co-treated L.S. in conjunction with the Speech Language Pathologist. *Id.* L.S. only attended approximately half of his scheduled Physical Therapy sessions. *Id.* L.S. did not have trouble understanding directions during occupational/physical therapy sessions. *Id.*, 39. However, those therapists had limited understanding of how L.S. used his device for expression and did not know how to engage back and forth with him. *Id.*

L.S.'s parents were given a Zoom link by Special Education Director Cindy Phillips to a daily living class, which they understood they could turn on, but were given no more information including any information about the teacher or curriculum or why the instruction would meet L.S.'s needs. *Id.*, 37. Ms. Schneider did not ever turn on the Zoom link because she had other things she needed to do and L.S. was at the clinic as well. *Id. See also id.*, 22-23 ("Despite being provided the virtual class link and despite Student being unable to log into class on his own, Parent did not log him in, stating that she had other things to do and that it was the Student's responsibility, or his one-on-one aid, or his teacher, to sign him on to a remote class he was attending at home."). Los Lunas High School recorded L.S.'s nonattendance on Zoom classes during the 2020-21 school year as "special circumstances." *Id.*, 48.

The CEL teacher did not contact Parents at the beginning of the school year when she contacted other parents, because L.S. did not "show up" on her caseload until later in the school year, although she might have sent them an email.  *Id.*, 38-39.  She did attend a Zoom Addendum IEP meeting for him in August 2020, in which the only document created was a PWN; no IEP was created at the meeting.  *Id*., 39.  She said nothing during the meeting.  *Id*.  After the IEP meeting, she never had any contact with PRISM, the private BCBA provider.  *Id*.  She has never talked with Parents about L.S. or her class.  *Id.*  The CEL teacher has never seen L.S.'s current, May 1, 2020, IEP.  *Id*.  She does not believe there are any records available on L.S. in the District's electronic files. *Id.*

The District contracted with PRISM, an outside service provider, to provide L.S. with some services.  *Id.*, 22.  PRISM began working with L.S. in October 2020, pursuant to a contract with Los Lunas Schools that lasted for the school year, until sometime in May 2021.  *Id.*, 30. At that time, no students attended Los Lunas campuses and PRISM was able to provide services to L.S. at its clinic, working on reduction of maladaptive behaviors and development of skills for replacement behaviors.  *Id.*, 30.  Hours of service to be provided by PRISM to L.S. were determined by the District, as well as when Parent could transport and stay with L.S. at PRISM. *Id.*  The hours of service were clinically inadequate.  *Id.*  There was some discussion initially about having L.S. be on Zoom to a District class but that did not happen, and the District never instructed PRISM on that or inquired about it.  *Id.*  PRISM contracts with Los Lunas and cannot control what the District does or does not do with reference to any of its recommendations*. Id.*, 31.

Although assigned to Los Lunas High School for the 2020-21 school year (9th grade), L.S. has never been to Los Lunas High School.  *Id.*, 34.  Although the May 2020 IEP states that the IEP team would be reconvened when schools reopened, that never happened. *Id.*, 34.  When school

campuses were reopened in April 2021 (following public health orders limiting in-person school attendance and requiring remote or hybrid learning), according to Ms. Schneider, Parents were never contacted to initiate L.S.'s attendance at Los Lunas High School or to schedule an IEP.  *Id.*

When New Mexico schools returned to in-person learning in April 2021, about seven of the CEL classroom students attended.  *Id.*, 39.  The teacher did not provide any notice to Parents that L.S. could attend school at Los Lunas HS.  *Id.*  Although the District had some system of automatic "survey" emails sent to families regarding return to school campuses in April 2021, the District does not know whether those emails were sent to the Schneiders; the school site (Los Lunas HS) had responsibility for following up if responses were not received.  *Id.*, 51.

The Director of Special Education does not know why the District did not schedule L.S.'s annual IEP before its due date on May 1, 2021.  *Id.*, 34.  Ultimately, L.S. was provided no instruction from a teacher during the 2020-21 school year, either during remote learning or when students returned to campus.  *Id.*, 37.

**c.  L.S.'s Communication**

As a result of Angelman Syndrome, L.S. does not communicate orally with words, and instead communicates through use of an AAC device aided by gestures, vocalizations, and some use of signs.  *Id.*, 25.  He has good receptive language and "understands many, many things."  *Id.*  L.S.'s expressive communication is more limited.  *Id.*  However, he "talks all day long" through the Proloquo2Go device to his mother or anyone else who will slow down and "listen" and learn about how to encourage L.S.'s use of Proloquo2Go.  *Id.*, 25-26.

Proloquo2Go is loaded onto various portable devices which L.S. can then use to communicate.  *Id.*, 40.  He operates the program by opening various screens, categorized by purpose or content, which allow him to "find" the words/icons to express his

16

thoughts/wants/needs/ questions/statement/comments in phrases or complete sentences. *Id*. The device is L.S.'s "voice." *Id.* Reliance on AAC loaded with Proloquo2Go for communication is not easy; it takes work. *Id.* When L.S. visited Valencia MS in 2018, it was chaotic and so he could not use his device to respond or have reciprocal conversation with the many school staff present. *Id.*

Two-way communication with L.S. can be slow and his conversation partners must be both patient and familiar with Proloquo2Go. *Id*., 26. If the educator/adult is not educated in use of Proloquo2Go and/or is unwilling to use it, there is only one-way communication by L.S. who will feel ignored. *Id.* Ignoring L.S.'s communication, talking about him instead of to him, and failing to understand him, can lead to frustration for L.S., just as it would for anyone. *Id.*

According to Ms. Schneider, in order to support L.S.'s communication needs, "everybody who's talking and interacting with [L.S.] should have their own device. . . . that way, they can model"; there should be multiple devices in L.S.'s educational environment so that each adult can model and elicit direct communication with L.S. *Id*., 40. In practice, the only LLPS employee who has ever had a device loaded with Proloquo2Go to allow for 2-way direct communication with L.S. has been the SLP. *Id.* Although Los Lunas contracted with various BCBA providers to work with L.S. since 2018, the District never provided the BCBA providers with devices loaded with Proloquo2Go, which would have supported L.S.'s functional expressive communication. *Id.*, 41.

While the November 2018 IEP records that L.S. used Proloquo2Go for communication, according to Ms. Schneider, no staff at Valencia MS or any District school staff, or related services staff (other than the SLP) was familiar with or had been trained on use of Proloquo2Go through the time of due process hearing (June 2021). *Id*., 41. According to Ms. Schneider, no one worked

17

on the November 5, 2018, IEP communication goal, ever.  *Id.*  According to Ms. Schneider, L.S. received no speech language therapy services during 6th, 7th, or 8th grades; SLP services did not begin until therapy delivered through Zoom beginning in summer 2020.  *Id.*  The SLP originally assigned to work with L.S. for the 2020-21 school year had never worked with a student who uses Proloquo2Go, prior to working with L.S., and has no formal training in Proloquo2Go.  *Id.*

The supervising Physical Therapist understood from the SLP that L.S. "liked using his speech program on the iPad" but apparently received no training on Proloquo2Go; she observed that L.S. was pretty sociable and liked to greet staff.  *Id.*, 41-42.  It was "tricky" to use Proloquo2Go in remote learning because when the staff showed L.S. their device, he could not also see them and what they were directing him to do.  *Id.*, 42.

After the May 2020 IEP when Los Lunas initiated limited services over Zoom in the summer of 2020 and intermittently during the 2020-21 school year, the SLP was co-treating with the social worker.  *Id.*, 42.  The social worker has never worked with a student who communicated through an assistive device; he has received no training on Proloquo2Go.  *Id.*  He would plan to read or show L.S. books or social stories and work on simple greetings; he is uncertain how much L.S. would comprehend.  *Id.*  He knows that L.S. can already use his device to greet people but thinks maybe that would change when on a campus.  *Id.*  The SLP originally assigned by Los Lunas HS to work with L.S. during the 2020-21 school year had no knowledge about AS and had never worked with a student who communicated through Proloquo2Go before L.S.  *Id.*

### d.  Input from Parents and Education Professionals

Parents have consistently emphasized that Los Lunas staff need to be supported by a BCBA in attendance with L.S. and that Los Lunas staff needs to "receive extensive training in the use of this augmentative communication device, his specific app, as well as augmentative communication

and Angelman Syndrome." *Id.*  At least some of the District administration understand that a BCBA at school needs to be in place for L.S. to attend, but the District has not contracted with any BCBA to work with L.S.'s staff during the 2021-22 school year.  *Id.*  Staff at the high school are ready to support L.S. in his academics, but not his behavior, according to the current District Director of Special Education.  *Id.*, 39.

According to Andrea Montoya, CEO, BCBA, and an SLP for PRISM, PRISM did not have a lot of ongoing communication with Los Lunas Schools after the contract was put in place; PRISM was never asked to provide any recommendations by the District and understood the contract was in place because PRISM could provide some face-to-face service at its clinic during the period District's campuses were closed.  *Id.*, 26-27.  PRISM has never been asked to visit school campuses to identify an appropriate physical classroom space for L.S.  *Id.*, 27.

Ms. Montoya testified that Applied Behavior Analysis ("ABA") is a method of assisting in skill acquisition and the management of behavior (including but not limited to maladaptive behaviors).  *Id.*, 29.  Registered Behavior Technicians ("RBT") provide the direct service of ABA overseen by a BCBA.  *Id.*  ABA is very systematic and dependent on school staff knowing the principles to prevent interventions that go against ABA and the student's program.  *Id.*  Ms. Montoya testified that, for L.S., consistent implementation of services is a prerequisite to success. *Id.*  She also testified that any school staff who work with L.S. need "intensive training and ongoing support."  *Id.*  According to Ms. Montoya, the staff would need to be working alongside PRISM staff to be trained and learn strategies, and that can happen concurrent with L.S. returning to school. *Id.*, 29-30.  Before school staff work alongside PRISM, they would need to receive pre-training and demonstrate competency in the prerequisite skills.  *Id.*, 30.  In order to support L.S. behaviorally, there is a need to start with "a very specialized person initially" and then, from that

person, incorporate generalization to other school staff. *Id.* "[I]t's all about staff proficiently demonstrating implementation of a plan that is written." *Id.* Ms. Montoya would support ancillary services being provided to L. S., initially staffed by PRISM RBT. *Id.*

Ms. Montoya recommends an intensive ABA program of 40 hours per week for L.S. *Id.*, 31. ABA services can be provided "in conjunction with academics or school-based." *Id.* Provision and type of ABA service would need to be responsive and appropriate to current level of need and changes that occur. *Id.* Ms. Montoya recommends that at the beginning, services in the school environment would be less than 40 hours with a goal of titrating up to 40 hours based on analysis of data. *Id.* Ms. Montoya recommends that provision of ABA services needs to be at the school building environment on a campus with peers to allow L.S. to generalize his transition. *Id.*, 32. Ms. Montoya states that there would need to be a designated School District employee on the campus who could coordinate with PRISM on a daily, ongoing basis for unexpected events as well as carrying out of plans. *Id.*, 31.

At time of due process hearing, PRISM did not have staff (RBT, BCABA, BCBA) in place to provide the school-based program to L.S. and would need to hire additional personnel. *Id.*, 31. Any school staff assigned to work with PRISM and receive intensive training in working with L.S. would need to first have "generalized knowledge of ABA and what [PRISM's] doing" and some "pre-training." *Id.* Then other staff in the area would also need to have general knowledge of ABA principles to ensure that they did not respond to L.S. out of ignorance and cause escalation. *Id.* The teacher, who will "guide the ship," needs to be trained. *Id.*

Ms. Montoya testified that "one of the most important things that we can do for [L.S.] is build his trust." *Id.*, 32. Ms. Montoya believes that Mother's physical presence at the school site when L.S. is there working with the RBT/staff is needed until L.S. develops solid trust of

providers/staff in the new environment, with Mother's role to be faded out as a distinct primary goal.  *Id.*

The DPH Settlement Agreement provided that a BCBA would begin assessing and working with L.S. and staff in November 2017 and continuing until January 1, 2019.  *Id.*, 32.  After the first BCBA started there were a series of BCBAs who worked with L.S. at home or private therapy settings.  *Id.*  Although some of the BCBAs wrote different Functional Behavior Assessments ("FBA"), it is not clear that they were ever shared with the IEP team.  *Id.*, 32-33.  The FBA written by BCBA in June 2019 was never relied on or used by the School District.  *Id.*, 50.

The FBA which had been written prior to the Valencia Middle School visits in August 2018 explained that L.S. was more likely to exhibit challenging behavior "in environments with rigid structure, high demands, and restricted access to preferred items and activities, unstructured time, and or highly stimulating environments."  *Id.*, 33.  Insistence on compliance with adult directions was not an effective strategy as that could simply backfire by reinforcing the challenging behavior.  *Id.*  The November 2018 IEP has no information on present levels of academic achievement.  *Id.*  This IEP was in effect until the LLPS created a new IEP in May 2020 (end of 8th grade year).  *Id.*  After the November 2018 facilitated IEP, the LEA did not conduct an IEP for L.S. until May 2020.  *Id.*, 51. Neither of the IEPs provided for delivery of specialized instruction by the LEA.  *Id.*  Although the November 2018 IEP states that L.S. would receive speech language therapy, physical therapy, occupational therapy and social work, the LEA did not provide any of those related services during the 2018-19 school year and the 2019-20 school year.  *Id.*, 51. Although the November 2018 IEP provides for development of a support plan for L.S., that has never happened.  *Id.*

21

The LEA has not conducted an FBA or written a Behavioral Intervention Plan ("BIP") for L.S. since he was 10 years old. *Id.*, 37. At that time, the District's plan for L.S. relied on use of physical restraint which Parents oppose. *Id.* Documents found in the due process exhibits were created by BCBAs who saw L.S. in the home environment or in the private clinic; no FBA was ever done for L.S. by a BCBA assessing him in a school setting. *Id.* The Los Lunas HS special education teacher testified that "a full-time BCBA, that's like a dream of every teacher to have a full-time BCBA in the classroom." *Id.*, 39. The LEA does not employ BCBAs on staff. *Id.*, 50. To implement the DPH settlement agreement with Parents , the LEA contracted with several agencies who supplied a BCBA, but those agencies had multiple staffing changes which resulted in 1) lack of continuity; 2) gaps in any BCBA service; 3) never accomplishing L.S.'s education at school with staff and L.S. supported by a BCBA who had educated staff about ABA principles and supports for L.S. in any challenging behaviors. *Id.*, 50-51. BCBAs contracted by Los Lunas to work with L.S. provided no academics. *Id.*, 33.

According to Ms. Schneider, in order for the Los Lunas District to provide education to L.S., school staff would need to be supported by 1) a BCBA who knows L.S.; 2) expert(s) in Angelman Syndrome and 3) individuals who use augmentative communication devices. *Id.*, 27. Parents' position has always been that L.S. is entitled to full day, every day, education like other students receive. *Id.*, 35. They report that they have repeatedly provided staff with knowledge about how to engage him and to prevent behavior escalations. *Id.*, 35-36. They assert that they have been "trying and working for four years" to get education from Los Lunas for L.S. *Id.*, 36.

Julia Daniels, a Speech-Language Pathologist, originally worked with L.S. in 2013-2015 and again once some services were initiated for L.S. in summer of 2020. *Id.*, 27. Ms. Daniels received training on Proloquo2Go during the 2013-2015 period and has worked with other students

who use the same program.  *Id.*  Ms. Daniels testified that L.S. has a strong vocabulary, and she was working with him on building sentences.  *Id.*  L.S. may have difficulty sometimes using his device to show all of his knowledge due to lack of physical coordination in selecting/showing the correct answer.  *Id.*  Ms. Daniels uses visual schedules and cues with L.S.  *Id.*  She believes L.S. needs a classroom with small group instruction (3 or fewer students) with a visual schedule, visual supports, and motor breaks.  *Id*.  She does not know if the high school CEL classroom is an appropriate placement for L.S.  *Id.*

Ms. Daniels testified that small group instruction allows L.S. to use his communication device and have turn-taking with communication.  *Id*., 28.  Ms. Daniels also testified that it is very important that a 1/1 Educational Assistant assigned to work with L.S. receive training on use of Proloquo2Go.  *Id*., 28.  She testified that it is possible to teach nondisabled peers or peers who do not use AAC to use Proloquo2Go.  *Id.*  Though, even for L.S., the use of the device requires a lot of effort and concentration and time.  *Id.*  Importantly, the AAC device can voice L.S.'s communications to his conversation partner(s).  *Id.*

According to Ms. Daniels, it would be important that when L.S. attends school all staff who work with him have a device loaded with Proloquo2Go and that they receive training and support on how to use that to communicate with L.S.  *Id.*  "[O]ne of the things we learn with the AAC is to be patient and provide a waiting time, which can be hard. It can be hard for a variety of people to provide the waiting time."  *Id*.  Proper use has to be practiced and encouraged.  *Id*. Failing to wait for a student to respond can make the student "feel dismissed. They can feel not heard, frustrated."  *Id.*

e. **2021-2022 School Year and the Roles of District Personnel**

LLPS 2021-2022 school year began on August 4, 2021. *Id.*, 23. In October 2021, L.S. was a 10th grade student assigned to Los Lunas High School. Doc. 4., 18, 84. L.S. had not received any education on a school campus since the 2016-2017 school year. *Id.*, 23. LLPS had no current IEP for L.S. and no plan for his receipt of education during the current (2021-22) school year, which began in the District for other students on August 4, 2021. *Id.* The District does not know which students with disabilities were not successful with remote learning and does not know what it will do for students who were not successful. *Id.*, 24.

The April 26, 2021 due process request was Parents' third attempt to obtain FAPE for L.S. using the dispute resolution mechanisms described by IDEA as made available in New Mexico through the SEA, NMPED. *Id.* LLPS' Director of Special Education, Cynthia Phillips, retired effective May 1, 2021, a few days after the request for due process was filed on April 26, 2021. *Id.* During the years relevant to the administrative proceeding below, Ms. Phillips was the Parents' main contact at the District and the designated administrator for L.S.'s education. *Id.* She was the District's main contact for PRISM Therapy during the 2020-2021 school year. *Id.* At the time of the four-day administrative due process hearing in June and July 2021, the District maintained that it did not know how to reach Ms. Phillips, and she was not made available to testify. *Id.*

The District's current Director of Special Education, Mary McGowan, came into that role on May 1, 2021. *Id.*, 25. Ms. McGowan has not done any work on L.S.'s education except for attending a Zoom meeting with NMPED's CAP monitor and reading some documentation. *Id.* She is "curious to see and hear from PRISM about [L.S.'s] progress." *Id.* She has not been assigned any particular role or duties with regard to his education. *Id.* However, apparently, she is currently responsible for being "the point of contact." *Id.* She has not tried to figure out what

needs to happen for L.S. to return to school. *Id.* She thinks that the District "has done the very best it can with [L.S.]." *Id.* She did not know if the District would need help if there was a finding against it in the Due Process Hearing. *Id.*

Ms. McGowan has never had special education teacher license; at one time, she had an "alternative license," but she allowed that to expire. *Id.*, 29-30. According to Ms. McGowan, the District asked for but never received any progress notes from PRISM, even though they contracted with PRISM to provide L.S. with BCBA services since October 2020. *Id.*, 30. There was never a FBA or a behavior support plan created to support L.S. at school since he was never allowed to attend school and no assessment or plan could be created to support him in an environment that he was not a part of. *Id.*, 52.

The District's former superintendent, Dana Sanders, was ordered to appear and give testimony though a DPHO-issued Administrative Order to Appear. *Id.*, 25. Through counsel, ex-Superintendent Sanders declined to appear and testify since the Administrative Order to Appear issued by the IDEA DPHO was unenforceable. *Id.*

**f. The Parties' Knowledge About Angelman Syndrome**

Elizabeth Cassell from NMPED stated that she assumes that the District knows about AS since the District was responsible for providing education to L.S., a student with AS. *Id.*, 42. NMPED has no resources for families or school districts on AS. *Id.*

Although L.S.'s father, Dr. Schneider, is a board-certified internal medicine physician, he had no familiarity with AS when L.S. was born/diagnosed. *Id.*, 43. Although Ms. Schneider, L.S.'s mother, was trained as a teacher, she had no knowledge about AS when L.S. was born/diagnosed. *Id.* Parents have had to learn about AS and L.S.'s needs on their own and have devoted significant resources and dedication to understanding AS, L.S.'s needs and providing for

his needs at home and in his community.  *Id.*  Parents shared information and resources about mosaic Angelman Syndrome with the School District and L.S.'s school/teachers/staff.  *Id.*

Part of the information shared by the family was providing connection to Erin Sheldon, an educator in Canada knowledgeable about AS, who came twice to Los Lunas to provide training on AS and recommendations for L.S.  *Id.*  Parents state that they never saw that the District or school staff embraced or acted on the information they provided or made available regarding AS.  *Id.* According to Ms. Schneider, Los Lunas received information about AS from Erin Sheldon whom it contracted with most recently in summer 2017, but the District never incorporated or relied on the information about AS and L.S.'s needs that she provided to the District over several visits/reports.  *Id.*, 43-44.   According to Ms. Schneider, Parents have never been provided any information from the District concerning AS or the education of students with AS.  *Id.*, 44.

L.S. is himself wherever he is; his symptoms of AS will not go away or disappear or be "fixed."  *Id.*, 44.  L.S. responds to the environment where he is based on how people understand him, treat him, and support him.  *Id.*  He is generally very positive and excited to be with people who treat him with respect and allow for 2-way communication.  *Id.*  Parent believes that staff need an RBT level of training because they have been unable to work successfully with L.S.  *Id.*

At home and in the community, Parents anticipate and support L.S.'s needs, including such things as unwillingness to transition from one setting to another.  *Id.*  Parents believe that school staff, who have not ever worked with L.S. or seen him on a school campus for more than four school years, will need a behavior support plan to provide them guidance on what to look for and how to support him in a school environment.  *Id.*

The social worker assigned to work with L.S. during the 2020-21 school year believes that when L.S. attends school in person, social work service would focus on "simple greetings" and

"being able to kind of just stay in a chair for a certain amount of time" and teaching L.S. self-advocacy skills.  *Id.*, 44-45.  The social worker believes possible new IEP goals for L.S. would be staying in his seat and following a teacher's visual prompts.  *Id.*, 44.  The social worker lacks knowledge about Angelman Syndrome.  Since he has 30-plus students, he has limited time to attend any trainings related to L.S.  *Id.*

In order to support their son, who requires 24/7 care, Ms. Schneider believes that there needs to be direct support and care for L.S. as well as extensive ongoing research and outreach, to obtain information about AS and provision of education to students with AS.  *Id.*

### g.  The DPHO's Decision

As relevant to this matter, the DPHO found that Petitioners met their burden on the issue of the denial of FAPE and that FAPE was denied to L.S. by LLPS.  Doc. 4 at 70.   The DPHO relied on the *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982) to determine whether FAPE was provided.  Doc. 4 at 66.  Specifically, the DPHO recognized he had to determine "whether (1) the school has complied with the procedures set forth in the IDEA, and (2) whether the IEP developed through the IDEA's procedures reasonably calculated to enable the child to receive educational benefits?" *Id.* (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206-207(1982).  Applying this test, the DPHO found:

> The failure of the District to provide any classroom education to L.S. for a period of more than four years, beginning with the 2017-2018 school year, amount to a failure to provide FAPE. This failure amounts in part to both a procedural failure (by failure to complete the annual IEP that was due in May 2021), and a failure to meet the requirement that IEP procedures were reasonably calculated to enable the Student to receive educational benefits (by failing to provide the Student with a classroom education for over four years).

Doc. 4 at 67.  The DPHO "agree[d] with Petitioners that the ancillary service minutes in the summer of 2020 and the 2020-2021 school year and the BCBA clinic time divorced from any

school goals has not been provided in his [least restrictive environment] and has not provided

meaningful education, allowed him to meet challenging objectives, or given him any access to his

peers, in violation of *Endrew F.*, 137 S.Ct. 988, 1000 (2017), and *L.B. v. Nebo School Dist.*, 379

F.3d 966, 976 (10th Cir. 2004)." Doc. 4 at 67.

The District violated *Endrew F.* further because, "in failing to provide classroom education,

the IEPs developed by the District were not 'appropriately ambitious' for this Student," and in

failing to have a clear plan for getting L.S. into school the District failed to implement an IEP that

reasonably aimed to enable L.S. to make progress." Doc. 4 at 67.

The DPHO found that:

> The District appears to be making little or no effort to rectify this failure to plan for
> and achieve a return to school for L.S. in addition to the lack of a current IEP, the
> testimony of Mary McGowan, the Director of Special Education for LLPS,
> indicates that she has not done any work on L.S.'s education except for attending a
> Zoom meeting with NMPED's CAP monitor and reading some documentation. She
> has not been assigned any particular role or duties with regard to his education. She
> has not tried to determine what needs to be done for L.S. to return to school.

Doc. 4 at 68.  Additionally, the DPHO considered specific key facts in determining the District

had denied FAPE to L.S.:

- L.S. has not been provided any education on a school campus for more than
  four years (2017-18; 2018-19; 2019-20, 2020-2021.)
- LLPS has no current IEP for L.S. and no plan for receipt of education for
  the 2021-22 school year, which began on August 4, 2021.
- The LEA did not provide L.S. with IEP goals for academics and access to
  the general curriculum.

*Id.*  The DPHO noted that the expert report of Erin Sheldon, M. Ed., supported the conclusion that

"L.S. is capable of a more challenging learning environment."  *Id.*  Ms. Sheldon opined that L.S.

"lacked an appropriately challenging and engaging academic curriculum."  *Id.*

The DPHO went on to find that the District's explanations for why it failed to provide L.S. with a classroom education for over four years did not justify L.S. not receiving any classroom experience during that period. *Id.* The District argued that the Parents' claim of a failure to provide FAPE "must be weighed against the efforts by the District." *Id.*, 68-69. The DPHO rejected this argument, finding it "not persuasive," *id.*, 69:

> Deference is to be given to the expertise and exercise of judgment by school authorities, and parents are given the opportunity to fully air their opinions. *Endrew*, 137 S.Ct. at 1001. The efforts made by the District have been considered, but the DPHO finds that they were not appropriately ambitious. The failure to provide a classroom education for over four years cannot simply be accounted for by factors like the Parents' delays in response, the Student's attendance issues, or the Parents' demand for full-day classroom attendance. First, any delays in response must also be considered in light of Ms. Schneider's extensive participation in L.S.'s experiences with ancillary services on Zoom.

*Id.* The DPHO noted that it was not established that it would be appropriate for L.S. to return to a full-time classroom at the time of the DPHO's decision; that issue needs to be considered in the context of an independent educational evaluation. *Id.* However, the DPHO found:

> it is not reasonable to conclude that the failure to provide classroom education for over four years was appropriately ambitious. The record does not include any serious efforts by LLPS to get L.S. back in the classroom. The DPHO recognizes that there were, for example, behavioral issues with L.S. but those experiences do not justify keeping out of school for extended periods of time. It is troubling that L.S. has had no classroom in-person instruction over the last four years from LLPS in reading, math, and written language. It is also troubling that the District comprehensive assessment of the Student since 2014. These issues also contribute to a determination that FAPE has been denied.

*Id.*

After recounting the parties' positions on remedy, the DPHO ordered specific remedies for the denial of FAPE. *See id.*, 72. The DPHO ordered a comprehensive independent educational evaluation of L.S., to be conducted by a person with expertise in Angelman Syndrome and education, at the cost of the LEA, pursuant to 20 U.S.C. § 1415(b)(1) and 34 CFR § 300.502(d). *Id.*, 80. In response to the District's persistent argument that parental preference for a child's

education program should not be the only factor, the DPHO emphasized his recognition of that

principle and found it was "not the only factor." *Id.* Instead, the record before the DPHO was

clear that,

> Angelman Syndrome significant factor in the challenged faced in providing FAPE
> to the Student. It is also clear that AS is a little-known condition and that many of
> the people involved in L.S.'s life have had little or no experience with it prior to
> their experience with L.S.

*Id.* The DPHO also found that "significant efforts" should be made to return L.S. to a

classroom setting. *Id.* The DPHO summarized the entirety of his order:

1. A denial of FAPE occurred because LLPS failed to make reasonable efforts to
   provide in-person classroom education to L.S. over the last four plus years.

2. The DPHO orders that a comprehensive independent educational evaluation
   (IEE) of L.S. be performed, pursuant to 20 U.S.C. § 1415(b)(1) and 34 CFR §
   300.502(a) and (d) by a person with expertise in Angelman Syndrome and
   education in order to develop and recommend an appropriate educational
   program for L.S. This evaluation should be conducted without unnecessary
   delay, within 30 days of notice from the District of the independent educational
   evaluation process.

3. Notice of the evaluation will be provided within 30 days of this Decision.

4. LLPS will, without unnecessary delay, provide Petitioners with information
   about where and with who the IEE will be obtained. See 34 CFR §
   300.502(a)(2).

5. The IEE will be conducted by a qualified examiner not employed by LLPS,
   pursuant to 34 CFR § 300.502(a)(3)(i).

6. The independent educational evaluation shall be paid for by the LEA, pursuant
   to 34 CFR § 300.502(a)(3)(ii).

7. The IEE will be provided to the parties.

8. An IEP should be completed without undue delay after completion of the
   independent educational evaluation.

9. Compensatory education services shall be provided for four years by the
   District for the lack of appropriate services over the last four years, and the
   Student's eligibility for IDEA services shall be extended beyond age 22.

10. The placement of the Student should be based upon the IEE report.

11. The IEP should be facilitated by the expert who performs the IEE.

12. The District shall hire a full-time BCBA and a Registered Behavior Technician and other needed personnel to work with the Student in the school setting to ensure that the Student has the support needed to successfully transition and attend school full-time.

13. The District shall provide training by experts for school staff, including in Angelman Syndrome and Proloquo2Go.

14. The District shall provide Proloquo2Go software to the Student and staff who work with him.

*Id.*, 82-83.

## IV.   LEGAL STANDARDS

### a.   Standard and Scope of Review in IDEA Cases

The party seeking relief under the IDEA bears the burden of proof before the hearing officer.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51 (2005).  However, "the party challenging the administrative decision bears the burden of persuasion before the district court," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012),[6] to show "that the hearing officer was wrong[.]"  *Reid ex rel. Reid. v. District of Columbia*, 401 F.3d 516, 525 (D.C. Cir. 2005).

"Unlike the deferential review typically afforded to administrative adjudication of statutory claims, Congress requires district courts to apply a modified de novo standard when reviewing agency disposition in the IDEA context." *Jefferson Cty. Sch. Dist. R-1 v. Elizabeth E. ex rel.*

---

[6] The Court is unaware of, and neither party explained, how the Tenth Circuit allocates the burden of persuasion when a party challenges an IDEA administrative hearing at the district court level. Although not binding, the Court applies the rule described in *Ridley* given that multiple federal circuit courts place the burden on the party challenging the administrative hearing. *See* 680 F.3d at 270 (discussing three federal circuits in accord).

*Roxanne B.*, 702 F.3d 1227, 1232 (10th Cir. 2012) (quoting *Garcia v. Bd. of Educ.,* 520 F.3d 1116,

1125 (10th Cir. 2008)). The district court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision

on the preponderance of the evidence, shall grant such relief as the court determines is

appropriate." 20 U.S.C. § 1415(i)(2)(C). The district court must give "due weight … to the

administrative proceedings, the fact findings of which are considered *prima facie* correct."

*Jefferson Cty. Sch. Dist. R-1*, 702 F.3d at 1232 (quoting *Garcia,* 520 F.3d at 1125). Legal

interpretations of the IDEA are reviewed de novo.  *Ellenberg*, 478 F.3d at 1274 (citation omitted).

### b.  Substantive Standards for the IDEA

"When a dispute reaches federal court, the court applies a two-step analysis …." *Sytsema*

*ex rel. Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008). The court asks:

"First, has the State complied with the procedures set forth in the Act? And second, is the

individualized educational program developed through the Act's procedures reasonably calculated

to enable the child to receive educational benefits?" *Bd. of Educ. of Hendrick Hudson Central Sch.*

*Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206-07 (1982) (footnotes omitted). "If the IEP

satisfies both steps, then the school district has complied with the [IDEA]." *Sytsema*, 538 F.3d at

1312–13 (citing *Rowley*, 458 U.S. at 207).

Concerning the first *Rowley* inquiry – whether the school district has complied with the

procedures of the IDEA – the Act states that in "matters alleging a procedural violation," a hearing

officer may find that a child did not receive a FAPE only if the procedural problem "impeded the

child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the

decisionmaking process regarding the provision of a [FAPE]" to their child, or "caused a

deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

However, "[p]rocedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity." *T.S. v. Indep. Sch. Dist. No. 54, Stroud, Oklahoma*, 265 F.3d 1090, 1095 (10th Cir. 2001); *Erickson v. Albuquerque Pub. Sch.*, 199 F.3d 1116, 1123 (10th Cir. 1999) ("a school district's failure to comply with statutory IEP content requirements did not amount to a substantive deprivation, so there was no violation of the student's right to a FAPE.") The central question, then, is whether the procedural violation "result[ed] in the loss of an educational opportunity" for the student. *T.S.*, 265 F.3d at 1095.

Regarding the second *Rowley* inquiry—whether "the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits"—the Supreme Court has recently clarified the standard for determining when such "educational benefits" are sufficient. *Boutelle v. Bd. of Educ. of Las Cruces Pub. Sch.*, No. CV 17-1232 GJF/SMV, 2019 WL 2061086, at *8 (D.N.M. May 9, 2019) (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, ––– U.S. ––––, 137 S. Ct. 988, 993 (2017)). Specifically, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* (quoting *Endrew*, 137 S. Ct. at 999).

"When a hearing officer or district court concludes that a school district has failed to provide a student with a FAPE, it has broad discretion to fashion an appropriate remedy, which can go beyond prospectively providing a FAPE, and can include compensatory education." *B.D. v. D.C.*, 817 F.3d 792, 797–98 (D.C. Cir. 2016) (citation and quotation marks omitted). Compensatory education is an equitable remedy that "compensates for a past deprivation of educational opportunity rather than a deprivation of purely procedural rights." *Garcia*, 520 F.3d at 1125; *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 565 F.3d 1232, 1249 (10th Cir.

2009) (describing compensatory education as a court's equitable authority to order schools to provide educational services that were wrongfully denied). Such services "are designed to counteract whatever educational setbacks a child encounters because of IDEA violations—to bring her back where she would have been but for those violations." *J.N. next friend of M.N. v. Jefferson Cty. Bd. of Educ.*, 12 F.4th 1355, 1362 (11th Cir. 2021). "A court's award of compensatory education must be 'appropriate in light of the purpose[s] of the [IDEA].'" *Preciado*, 443 F. Supp. 3d at 1308 (quoting *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (internal quotation marks omitted, alterations in original)). The IDEA has four purposes: (1) provide all disabled students with a FAPE emphasizing services designed to meet their unique needs, (2) assist states with implementing a system of early intervention services for infants and toddlers with disabilities, (3) ensure that educators and parents have the tools necessary to improve disabled children's educational progress, and (4) ensure the effectiveness of efforts to educate children with disabilities. *Id.* (citing 20 U.S.C.A. § 1400(d)(1)-(4)).

In conducting its independent review, the district court must heed the Supreme Court's warning that "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Rowley*, 458 U.S. at 208 (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973)). Courts therefore "must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207 (footnote omitted).

### c. Scope of Review of Unsupported Assertions

An appellant's opening brief must identify "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (citation omitted). "When a party's

brief fails to provide citations in support of its factual assertions," the court does not "scan volumes aimlessly for asserted facts." *Aquila*, *Inc. v. C.W. Mining*, 545 F.3d 1258, 1268 (10th Cir. 2008). The court instead disregards such unsupported arguments. *Bronson*, 500 F.3d at 1104 ("we have routinely declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.") (citation omitted).

## V.   DISCUSSION

The District has asked this Court to find that the DPHO's decision in the matter below is "unsupported by a preponderance of the evidence and an abuse of discretion."  Doc. 23 at 1.  As part of its two-step analysis, this Court asks: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-07.   For procedural violations, the question is whether the violation "result[ed] in the loss of an educational opportunity" for the student. *T.S.*, 265 F.3d at 1095. Regarding the second inquiry, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999.

### a.   The DPHO Correctly Concluded that LLPS Denied L.S. a FAPE.

The District contests the DPHO's finding that the District denied FAPE because "LLPS failed to make reasonable efforts to provide in-person classroom education."  Doc. 23 at 5 (quoting DPHO Decision and Order).   The District argues that the DPHO "seemingly disregarded all attempts by the District to provide services to Student, the serious Student behavior that was occurring, and the fact that Parent has either denied such services or been wholly and unjustifiably dissatisfied with the attempts of the District to provide Student with FAPE." *Id.*  The District's main legal support for its argument is *Garcia v. Albuquerque Public Schools*, 520 F.3d 1116 (10th

Cir. 2008).  The District argues that, in *Garcia*, despite irregularities in a student's IEP, "the district

did not deny the student a FAPE and the court seriously considered the facts that the student did

not take advantage of the services provided to her and was regularly absent."  Doc. 23 at 6-7.  The

District argues that Parents, like in *Garcia*, "fail to meet their burden of proof, as they have failed

to show that any of the services provided and yet not accepted would have failed to provide the

student with FAPE."  Doc. 23 at 7.  The District argues Petitioners rejected services, insist on a

BCBA, refused to work with the school, and refused to accept any services less than full-time.  *Id.*

Parents respond that "[u]sage of the phrase 'reasonable efforts' in the DPHO's Order is

simply a summary description of the facts in the record which showed unequivocally that L.S. did

not receive public education and was not offered education on a school campus with peers."  Doc.

24 at 14.  Parents emphasize that:

> There is no "reasonable efforts" standard within the IDEA or any indication that
> failure to provide FAPE will be excused if a school district made "reasonable
> efforts." Such a defense is an anathema to the structure of the IDEA which is
> intended to *ensure* that *all* students with disabilities receive appropriate public
> education at public expense.

*Id.* (citations omitted).  Parents direct the Court to *Cedar Rapids v. Garret F.*, 526 U.S. 66 (1999),

where the Supreme Court rejected a school district's self-created defenses as they were "not

supported by any recognized source of legal authority."  526 U.S. at 75.

The Court finds that *Garcia* does not mandate the result the District seeks here.  In *Garcia,*

the Tenth Circuit addressed a district court's review of an administrative IDEA decision.  520 F.3d

1116.  The district court acknowledged procedural deficiencies in a school district's provision of

IDEA services to a student, but held no compensatory education services should be awarded,

> as a matter of equity because, among other things, Myisha has dropped out of
> school, demonstrated an unwillingness to return to school, and could essentially
> receive the very services she seeks simply by re-enrolling in school.

520 F.3d at 1119.  Significantly, in affirming the district court, the Circuit cabined its decision:

> we do not excuse the school district for neglecting its statutory duties to Myisha, but neither can we say that the district court abused its discretion in exercising its traditional equitable powers.

*Id.*  The Circuit did *not* direct district courts to ignore a school district's violations of the IDEA when a student has been absent from school, as the District here seems to contend.  Instead, the Circuit's decision to affirm the district court was,

> simply a product of the discretion that Congress reposed in that court. We cannot say that the court traversed the bounds of that discretion in determining that the relief Myisha seeks is neither necessary nor merited in light of Myisha's educational history and the educational services already available to her should she choose to return to school.

*Id.* at 1131.  Where an administrative hearing officer appeared to excuse a school district's procedural violations of the IDEA because of a student's unexplained poor behavior and absences from school, *id.* at 1121, the Circuit chose to "simply hold that the district court's decision [to withhold equitable relief] fell well within the broad parameters of the discretion Congress chose to invest in it." *Id.* at 1131.

In other words, this Court does not understand the Circuit's decision in *Garcia* to mean that this Court is required to reverse a DPHO's decision against a school district that denied a child FAPE because the child was occasionally absent or because, in the school district's view, the parents refused to work with the school.  The DPHO in this matter made exhaustive findings of fact after considering all of the evidence at the administrative hearing.  The DPHO's findings of fact are considered "*prima facie* correct" at this stage. *Jefferson Cty. Sch. Dist. R-1*, 702 F.3d at 1232.  The "party challenging the administrative decision bears the burden of persuasion before the district court," *Ridley Sch. Dist.*, 680 F.3d at 270, to show "that the hearing officer was wrong[.]" *Reid ex rel. Reid*, 401 F.3d at 525.  Applying the modified de novo standard required in

the IDEA context and having conducted its independent review, this Court is unpersuaded that the District has shown the hearing officer's decision finding that LLPS denied L.S. a FAPE was incorrect. The DPHO's decision is amply supported by the record, including the disturbing facts that, at the time of the DPHO's decision, 1) L.S. had not been provided any education on a school campus for more than four years (2017-18; 2018-19; 2019-20, 2020-2021.); 2) LLPS has no current IEP for L.S. and no plan for receipt of education for the 2021-22 school year, which began on August 4, 2021; 3) the LEA did not provide L.S. with IEP goals for academics and access to the general curriculum, and 4) LLPS was making little to no effort to rectify its failure to plan for and achieve a return to school for L.S., as evidenced by the Director of Special Education's testimony that she has not done any work on L.S.'s education except for attending one Zoom meeting with NMPED's CAP monitor and reading some documentation. She has not been assigned any particular role or duties with regard to his education. She has not tried to determine what needs to be done for L.S. to return to school. *See* Doc. 4, 68. Having reviewed the entire record below and the parties' briefs, the Court upholds the DPHO's decision that LLPS denied L.S. a FAPE.

### b. The DPHO's Remedial Award was not an Abuse of Discretion.

The District challenges two aspects of the DPHO's remedial award. First, the District challenges the DPHO's order specifying that the evaluation of L.S. must be completed by someone with expertise in Angelman Syndrome. Second, the District challenges the DPHO's order that the expert in Angelman Syndrome "facilitate" L.S.'s IEP.

### i. Evaluator's Expertise in Angelman Syndrome

On the first point, the District contends, "there was no evidence presented during the hearing that would give the hearing officer a basis to impart on the parent the right to determine

the qualifications that an examiner must possess to conduct an Individual Educational Evaluation." Doc. 23, 8.  The District argues, "The hearing officer's decision to order District to utilize an examiner who has the qualifications as dictated by parent is unreasonable and unfounded." *Id.* The District asserts that New Mexico state regulations allow a district to determine the qualifications for educational staff, including diagnosticians. *Id.*

The District primarily relies on federal regulations to support its argument.  The District summarizes that parents are "granted the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation," under 34 C.F.R. § 300.502.  Doc. 23, 9. However, the District argues, "Nothing in the C.F.R. grants a parent, on their own or through a hearing officer, the right to choose which qualified individual conducts the IEE, rather it leaves it up to the 'public agency' to simply 'ensure that the [IEE] is provided.' 34 C.F.R. § 300.502 (e)(1)." Doc. 23, 10.  The District argues that the regulations provide that the "qualifications of the examiner . . . 'must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an [IEE].' " *Id.* (quoting 34 C.F.R. § 300.502 (e)(1)).  In sum, "the District challenges the hearing officer's order which grants the parent's wish for a particular qualification to be present in the IEE examiner; this is an abuse of the hearing officer's discretion." Doc. 23 at 10.  The District concedes there are no Tenth Circuit cases nor persuasive District of New Mexico cases "fully on point." *Id.*   Instead, the District offers a few cases that indicate school officials generally may choose which qualified professional should conduct an evaluation. *Id.*, 11.

Petitioners respond by noting first that the District does not rely on any Supreme Court or Tenth Circuit precedent in support of its argument.  Doc. 24, 19.  Petitioners go on to argue that "the expert qualifications specified in the [DPHO's] Order flow from the totality of evidence in

the record about the complexity of L.S.' unique needs and the relationship to Angelman Syndrome." *Id.* Second, Petitioners assert that "the law is clear that [an] equitable remedy created to address denial of FAPE, by definition, means that the School District forfeited the 'right' to select an evaluator necessary for remedy when it denied Student a FAPE." *Id.*, 20. Petitioners state that in *Florence Cnty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, (1993), the Supreme Court "rejected a school district's argument that remedy of reimbursement for costs of a private school not on the 'approved' list was improper. The Court rejected the School District's position because it had violated 'IDEA's mandate' to provide FAPE." Doc. 24, 20 (quoting *Carter*, 510 US. At 15). In other words, "the School District did not have the right to complain about equitable remedy awarding tuition reimbursement for a 'non-approved' school once it had been determined that Student was denied FAPE." Doc. 25, 20.

Petitioners also rely on *M.S. v. Utah Sch. for the Deaf & Blind*, 822 F.3d 1128 (10th Cir. 2016), where "the Court rejected a remedy which directed that the IEP team would determine compensatory education." Doc. 24 at 20. According to Petitioners, the Court reasoned that "[b]ecause IDEA gave the DPHO authority to determine remedy for denial of FAPE, delegation to the IEP team would give the school district 'undue influence,' and therefore interfered with the intended structure of the IDEA which was to have a DPHO construct equitable remedy." *Id.*

Finally, Petitioners argue that the "District's citation to old decisions of other courts is also misleading because the cases are about standards for "independent educational evaluations" or IEEs which are requested by parents as part of their procedural rights, not independent evaluations ordered as part of equitable remedy." *Id.*, 20-21. Petitioners note that cases interpreting the law related to a parent's request for an IEE are not appropriate for assessing the propriety of an evaluation ordered by a DPHO as an equitable remedy for a denial of FAPE. *See id.*, 21.

The Court finds that the District has not shown that the DPHO abused his discretion in ordering that the person who evaluates L.S. must have expertise in Angelman Syndrome. The District has not identified any precedent, controlling or otherwise, that prohibits a DPHO from ordering that an evaluator have expertise in a child's particular disability. Moreover, the Court is reluctant to reverse a DPHO where the DPHO's reason for requiring this type of expertise is thoroughly supported by a record indicating the District's almost complete lack of information about Angelman Syndrome. The Court upholds the DPHO's order that the comprehensive educational evaluation of L.S. be performed "by a person with expertise in Angelman Syndrome and education in order to develop and recommend an appropriate educational program for L.S." Doc. 4, 83.

### ii.   IEP Facilitation by Expert

Finally, the District challenges the "hearing officer's order requiring the District to allow the same individual who serves as the IEE examiner to also serve as the facilitator for a required Facilitated IEP." Doc. 23, 11. The District points to a New Mexico state regulation that defines "Facilitated IEP meeting," and includes a provision that this type of IEP meeting "utilizes an independent, state-approved, state-funded, trained facilitator." *Id.* The District argues that the DPHO abused his discretion by ordering the Angelman Syndrome expert who evaluates L.S. to also facilitate the IEP meeting, because having an "unqualified, untrained, non-state-approved facilitator" would be contrary to law. *Id.*, 11-12. The District asserts that the Special Education Division of the New Mexico Special Education Department must assign an IEP facilitator, and the available online list only has three individuals listed. *Id.*, 12.

Petitioners respond: "The District latches on to the words 'facilitated by' and claims that this is intended to signify a 'facilitated IEP' within the meaning of state regulation describing various aids to IDEA dispute resolution."  Doc. 24, 21.  Petitioners argue:

> There is nothing in the decision or the record which substantiates the District's concern that the expert would act as an IEP "facilitator" as that term is used in state regulation. Instead, the intent is that the expert be directing the Team in documentation of an appropriate educational program as determined by evaluation. The independent professional is there to ensure or "facilitate" understanding of L.S.'s needs based on the current evaluation[.]

Doc. 24, 21-22.

The Court disagrees with the District that the DPHO's order requiring the Angelman Syndrome expert to facilitate L.S.'s next IEP meeting was an abuse of discretion.  The DPHO ordered that L.S.'s "IEP should be facilitated by the expert who performs the IEE."  Doc. 4, 83. The DPHO did not reference the state regulation specific to "Facilitated IEPs" to indicate that the state-specific parameters of a "Facilitated IEP" must be followed.  The DPHO's order was replete with information about the District's persistent and long-standing failure to provide L.S. with the FAPE he is entitled to.  It logically follows that the DPHO ordered the Angelman Syndrome expert to be present at and facilitate L.S.'s IEP meeting so that the District can finally begin to understand L.S.'s educational needs and provide him a FAPE.  The District has not shown how this was an abuse of discretion.  The Court affirms the DPHO's remedial award.

## CONCLUSION

The Court affirms the decision of the administrative DPHO.   The Court holds that the DPHO correctly concluded that LLPS denied L.S. a FAPE.  In addition, the Court upholds the DPHO's order that the person who evaluates L.S. must have expertise in Angelman Syndrome and that the IEP meeting for L.S. will be facilitated by this expert.

42

**IT IS THEREFORE ORDERED** that the District's request for this Court to reverse the

DPHO **(Doc. 23)** is **DENIED.**

**IT IS SO ORDERED.**

_____

HONORABLE DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE